JAMES E. CLAWSON,

*vs.*

JOSEPH PRIMROSE,

*Kent, Sept. T. 1873.*

The English doctrine of presumptive title to light and air, received over land of another person, arising from the uninterrupted enjoyment of it for twenty years and upward, through the window of a dwelling house, was part of the common law of England and of the colonies at the period of

American Independence, and as such continued to be the law of Delaware under the constitution of the State adopted at the organization of the State Government in 1776.

A court of equity will restrain the obstruction of lights, by erections on adjoining buildings, only when the privation of light and air by a proposed erection will be in such degree as to render the occupation of the complainant's house uncomfortable if it be a dwelling house, or if it be a place of business materially less beneficial than it had formerly been.

A fair test of what is such privation of light, &c., is the fact that a jury would give substantial and not merely legal damages.

The consideration that the party whose light and air is about to be obstructed, having an open space on another side of his house, can by other arrangements supply the deficiency of light and air, is not admissible to affect his right to enjoy his property after the manner in which he had previously held it.

Construction of that clause of the Constitution of 1776, declaring the common law of England to be in force in this State.

Principles for determining what parts of the English common law are inapplicable in this country.

The limits of judicial authority considered, with respect to alterations in the common law.

BILL FOR INJUNCTION.—It appeared that the complainant was the owner and occupier of a dwelling house, situated in the town of Smyrna, and adjoining on the Northerly side an unimproved lot of the defendant. In the complainant's house were several windows overlooking the defendant's lot and through which light and air were received into the house. At what precise time these windows were opened did not appear : but it was proved that they had been in their present condition, and used by the successive owners and occupiers of the dwelling house for a period of over thirty-five years past. The defendant being about to remove a frame tenement to the lot and to locate it against the notherly side of the dwelling house so as wholly to darken the windows, the bill was filed for an injunction to restrain the proposed obstruction.

The material facts touching the precise location of the windows and the effect of the obstruction are stated in the opinion of the Chancellor.

*Fulton*, for the complainant.

The single question is whether the English doctrine of ancient lights prevails in this country.

The ancient doctrine of prescriptive right founded on sixty years' possession or *user* has been abandoned in England for a century and, in lieu of it, a presumption of a grant from a twenty year's possession, assimilated to the statute, now obtains there. Whether it prevails here also is the question.

The first consideration is that Colonies settling in a new country and founding a government for themselves carry with them the laws and usages of the mother country so as they may be applicable,—more especially so when they continue subject to the mother country. This principle has given to us all the fundamental civil institutions and rights of England,—the trial by jury, *habeas corpus* &c. and the common law at large,—both its principles and general modes of practice.

The opinion of the bar in this State has been always understood to be in favor of the English doctrine.

The doctrine has been adopted in some states and rejected in others. Consequently the state cases are of no authority either way. The presumption with us is in favor of the doctrine. There should be reason, and strong reason, for the departure. It is recognized in New Jersey Illinois and Lousiana. *Robinson vs. Pittenger*, 1 *Greens' Ch.* 57 ; *Gerber vs. Grabel*, 16 *Ill.* 220. *Dune vs. Boisblanc*, 1 *Lou. Ann.* 407.

*Pierce vs. Lemon*, 2 *Houston*, 219, recognizes the doctrine in this State. The doctrine was rejected from the beginning in Maine, Connecticut and Pennsylvania. In New York, Maryland and Massachusetts, the English doctrine was originally adopted, but has since been rejected.

The reasons of the older cases are sounder. The later cases proceed upon the idea suggested by Bronson J. that the doctrine is unsuited to a new country. This is without any foundation. Light and air are as much necessities here as in an old country. They are valuable as incidents of property, as much so as a right of way. On the contrary there is more reason for it in a new country, since our towns settled rapidly and so as to afford no time for the twenty years' presumption to run. Besides there is less necessity for economizing space. The general effect of the doctrine upon the comfort and value of property is beneficial. It takes away no property but only qualifies the mode of enjoyment. The same objection taken to ancient lights would apply to a right of way; yet that is unquestioned.

The doctrine works no hardship; because the owner of the land affected may either require a written assent to hold the right permissively or he may obstruct it. His omission to do either is a consent, and works no hardship. Certainly, if the owner may, by twenty years' adverse possession, lose title to the land itself, he may with as little hardship have his mode of enjoyment qualified.

The most analogous cases are those of water courses. *Balston vs. Beusted*, 1 *Camp*. 463.

The flow of the water and of light and air, neither being subjects of property, may be assimilated. In the cases cited the parties had no knowledge of the current, it being subterranean,—yet the right attached.

The doctrine of prescription applies fully to this case. *Washburn on Easements*, 18, *pars.* 1, 2, 3, 4 ; 493, *par.* 6 ; 491, *par.* 4 ; *Cross vs. Lewis*, 2 *Barn. & Cress.* 686 ; *Higgins vs. McGregor*, 1 *Harr.* 447 ; 3 *Kent* 441-8 ; *Pierce vs. Cloud*, (6 *Wright*) 42 *Pa. St.*, 102 ; *Steffy vs. Carpenter*, (1 *Wright*) 37 *Pa. St.*, 41.

The ancient rule differed from the modern only in the lapse of time necessary to create the right. Originally it vested only upon prescription, according to the old notion, such as went beyond present memory. The later doctrine reduced the time required by analogy to the statute of limitations to twenty years. But that the right to ancient lights might be acquired by adverse enjoyment of some lapse of time has always been the English doctrine. .

The Statute of William IV, can have no bearing. The doctrine was unquestionably established before. What the statute was or why passed we know not. We have not the act. All we have is Judge Bronson's reference to it in a hostile opinion. The object of the statute was to make conclusive what before was only a presumption to be left to the jury. *Washburn* 493, *par.* 6¹; *Gerber vs. Grebel* 16 *Ills.* 220.

*Massey*, for the defendant.

The question is whether the mere enjoyment of a thing so incorporeal and intangible as light and air can vest a right in conflict with rights of property. It is termed " the anomaly of the English Law," and cannot be the subject of adverse enjoyment. There is no case in the state courts precisely like this. In those where the right is sustained it has been on the ground of grant express or implied ;—as, in New Jersey, where the claimant of the right had sold the land of the servient owner.

The first English case is *Ring vs. Pope, Cro. Eliz.* 118, which shows the state of the law before this anomaly had crept into the law.

It was there held that a possession of thirty-eight years did not give the right. The rule was not known prior to July 19, 1775. First ruled in *Darwin vs. Upton*, 2 *Saunders* 175, *in* 1786. *Washburn on Easements*, 497; *Parker vs. Foote*, 19 *Wend.* 309; *Cherry vs. Stein*, 11 *Md.* 25; *Myers vs. Gemmill*, 10 *Barb.* 537; *Hoy vs. Sterrett*, 2 *Watts* 331; *Haverstick vs. Sipe*, 33 *Pa.* 368; *Carrig vs. Dee*, 14 *Gray*, 583; *Pierce vs. Tumald*, 26 *Me.* 436. This case rests purely upon *principle*, and not on implied grant as do very many of the cases. Prescription springs from *adverse enjoyment*, of which light and air are not subjects.

The opening of a window infringes no right of the adjoining owner. He cannot prevent it by any legal remedy, as in case of the adverse possession of land or exercise of an easement in it; consequently as no right is infringed, and no legal remedy to prevent it, no prescription should run against him. Acquiescence is attributed only to one who can prevent it *i. e.* by legal means, not by a high wall, &c. *Cherry vs Stein*, 1 *Md.* 25.

Upon this distinction, *Robeson vs. Pittinger*, 1 *Green's Ch.* 57; *U. S. vs. Appleton*, 1 *Sumn.* 402; *Washburn* 505, *sec.* 27; *Napier vs. Bulwinkle*, 5 *Rich. Law (S. C.)* 311; *Maynard vs. Esher*, 17 *Penna. St.* 222; illustrates the distinction between implied grant and prescription.

To adverse enjoyment there must be *corporeal* possession or *user* as of land, water, way, &c. Here there is nothing but the fact that the neighbor has forborne to prevent the passage of light, &c. Light is not another's property which is held against him as an owner so as to affect him with a prescription. *Parker vs. Foot*, 19 *Wend.* 309.

In a late case in Virginia the Court said that the doctrine was still more inadmissible, if the party could otherwise obtain light and air, which in this case might be done from the other side.

The argument that our Colonial relation to England would draw to us the doctrine cannot hold.   For the other States were Colonies.   In fact this doctrine is not treated as properly a part of the common law, but an anomaly in it,—and that, even in England, it was so regarded is shewn by the necessity of the Act of Parliament 2 and 3 William IV, to establish it as the law of that country.

THE CHANCELLOR :—

Two preliminary objections were taken to the relief sought by the bill. One of them was this : that, even, conceding to the complainant, the right claimed, to receive light and air over the defendant's lot, yet, that the proposed obstruction will not impair his enjoyment of the dwelling house in such degree as to warrant the interference of a court of equity, but that he should be left to seek redress in damages at law.   The rule on this point as first announced by Lord Eldon, in *Attorney General vs. Nichol*, 16 *Ves. Jr.* 337, and followed in all subsequent cases is, that a court of equity does not in all cases restrain the obstruction of lights by erections on adjoining lands, even though the right is unquestioned or established, but only when the privation of light and air by a proposed erection will be in such degree as to render the occupation of the complainant's house uncomfortable, if it be a dwelling house, or if it be a place of business, the privation must render the exercise of the business materially less beneficial than it had formerly been.   *Wymstanly v. Lee*, 2 *Swanst.* 373 ; *Sutton v. Lord Montfort*, 6 *Eng. Ch. R.* 257 ; *Dent v. Auction Mar. Co.*, 2 *Law Reports, Equity Cases,*
82—DEL. CH. IV.

238.   In the latter case Sir W. Pagewood, V. C., enables us, by an easy test, to determine what is such a substantial privation of light and air as should induce this court to relieve.   He says " that where substantial damages would " be given at law, as distinguished from some small sum " of £5, £10 or £20, the court will interpose ; and on this " ground, that it cannot be contended that those who are " minded to erect a building that will inflict injury " upon their neighbor have a right to purchase him out " without an act of Parliament for that purpose having " been obtained."

In the present case the threatened obstruction, if the the complainant's title be conceded, is sufficient, within the rule, to be the subject of equitable relief.   The windows on the north side of the house overlooking the defendant's lot will be wholly closed.   One of these is in the cellar, and, without this window, there could be no means of lighting and airing the cellar.   Another window is in the kitchen, at the rear of the dwelling   The kitchen would be left with one window on the opposite or south side.   Another window is in the attic, at present the only window in that part of the house, though a witness states that other arrangements might be made for lighting that part of the house.

Another, and the most important of the windows threatened, is on the north side of the dining room.   There is no window on the south side of the dining room opening out of doors.   There was such a window in former years opening into a covered porch, but some sixteen years since the porch was enclosed and made a part of the interior of the house.   It so remains.   Mr. Stockley, who occupied the house before the porch was enclosed, testifies that, even with the south window opened as it then was, the room could not be comfortably lighted or ventilated without the north window, the porch having a

Opinion :—that light is attainable otherwise, no defence.

roof so low and wide as to admit but little light and air. It must be sufficiently apparent that the obstruction of these windows will very materially impair the complainant's enjoyment of his property.

But it is objected further that the complainant, having an open space on the South side of his house, can, by other arrangements, supply the deficiency of light and air, and that there is therefore no necessity for the interference of the Court. Without stopping to inquire whether adequate arrangements of that kind could be made, it is enough to say that such a consideration is not admissible to affect the right of the complainant to enjoy his property after the manner in which he previously held it. If the English doctrine of ancient lights be our law and the complainant has by twenty years user acquired a title to this servitude, most clearly the title gained is the right to enjoy his dwelling as he has so long held it, and he cannot be compelled to alter his house so as to suit the convenience of his neighbor. This principle has been recently adjudged by V. C. Sir Wm. Pagewood in the case of *Dent et al. vs. The Auction Mart Co.*, before cited. There the injunction was sought against the erection of a house at some short distance from the complainant's house, the effect being partially to darken a window, and one of the defenses was that the complainant could avoid the injury by enlarging his window. But the defense was not sustained. "The complainants," says the V. C., "are clearly entitled to "retain the right as they acquired it without being com- "pelled to make any alterations in their house to enable "other people to deal with their property." I have found no other case on this point in England or in America, though after diligent search.

We are then brought unavoidably to the main question in controversy, viz.: whether in this State uninterrupted enjoyment, by the owner of a tenement, of light

and air received laterally over the land of another for more than twenty years, raises a title to the future unobstructed use of the same:

Incorporeal rights generally, such as ways, water courses, &c., are the subjects of presumptive title, arising from twenty years' adverse user, by analogy to the Statute limiting entries into lands, and that, both in England and in this country. In England this general doctrine of presumptive title to incorporeal rights or easements includes, as one of them, the servitude of light and air. Does the law of presumptive title in this State, in like manner, extend to light and air? That is the question.

A careful reading of all that could be found to bear upon the subject, with much reflection, has led me irresistibly to the conclusion that the doctrine of presumptive title to light and air from twenty years enjoyment, as it was held in England prior to the Statute of 3 & 4 Will. IV (which simply converted the presumption of title into an absolute bar) was a part of the common law of title to real estate in England at the period of our separation from that country, and that by force of the constitution of this State, adopted in the year of its independence, that doctrine became the law of this State, subject only to alteration by the Legislature.

The Constitution of September 20, 1776, adopted, upon our separation from England, and organization into an independent State Government, provides by Art. 25, that " *the common law of England*, as well as so much of "the statute law as has been heretofore adopted in practice "in this State, shall remain in force unless they shall be "altered by a future law of the Legislature, such parts only "excepted as are repugnant to the rights and privileges "contained in this Constitution and the declaration of "rights, &c., agreed to by this convention."—*Delaware Laws, Appendix, page* 89.

The object of this clause was to secure to the people in their transition from a colonial to an independent political state, a jurisprudence already complete, and adequate immediately to define and to protect their rights of person and property, and of citizenship generally, without awaiting the slow growth of a new system to be thereafter matured by legislation and judicial decision.    They had already in their colonial state as subjects of Great Britain, an established jurisprudence in the common law of England. It was a system of jurisprudence to which our ancestors of that day were deeply attached. They had esteemed it throughout their colonial condition, to be their birth-right as English subjects, and their safest rule of conduct, so declaring it in several legistive acts.—(*See Preamble to Act of* 1719. 1 *Del. Laws,* 64.)

This attachment to the common law pervaded all the colonies. The Congress of 1774, in its enunciation of certain fundamental rights and immunities which were claimed for the American subjects of Great Britain, placed among the foremost of them the declaration that they were entitled to the common law of England, as also to such English statutes as were in force at the date of their colonization, and which by experience they had found applicable to their circumstances.—1 *Story on the Constitution, sec.* 158, *n.*

The provision of our State Constitution of 1776, adopting for the new State Government, the body of the common law, and in part the statutes of England, is the same in substance with the declaration of the Congress of 1774 of what had before been held to be the force of the English common and statutory law in the Colonies ; and the obvious purpose and effect of the 25th Article of the Constitution was to give to the common law in this State by constitutional adoption, the same force under the new Government which in their previous political condition it

had by virtue of their colonial relationship to the mother country. By the common law was of course meant the common law of England as it then stood, so far as it was applicable to the circumstances of the people, and was not repugnant, as the constitution expresses it, "to the "rights and privileges contained in that instrument and "the declaration of rights."

We now come to the two principal questions raised by the argument, viz :

(1)—Whether the English doctrine of a presumptive title to light and air from twenty years' enjoyment, by analogy to the Statute of 21 James I, was part of the common law of England prior to 1776—and

(2)—If so, whether under our State constitution of 1776 it became the law of this State.

*First, then*, was the English doctrine part of the common law prior to 1776?—

It has sometimes been spoken of as a modern doctrine. Its origin has been referred to two or three judicial decisions made between the years 1761 and 1786, viz : *Lewis vs. Price, Dougal vs. Wilson*, and *Darwin vs. Upton*. Even were these cases taken to have first incorporated the doctrine into the English common law they would carry it back to a period anterior to our State constitution of 1776. But it will be strictly correct to say that the English doctrine is in *its principle* a very ancient one. The principle is that uninterrupted user raises a prescriptive title to incorporeal rights and to the servitude of light and air as one of these incorporeal rights. This has been a principle of the common law from the beginning. It is true that the prescriptive period or the duration of the user requisite to raise the prescriptive title has been modified

several times in the lapse of the last three centuries, but the principle of prescriptive title has all the while been the same. The last change of the prescriptive period, that which reduced it to twenty years by analogy to the statute of James, was adopted long prior to the American Revolution, and from the time of its first adoption by judicial decision applying it to any species of incorporeal rights, it became the law of all such rights, and among them, of the servitude of light and air, before even the cases just referred to for its actual application to this particular servitude had occurred. This is but a general view of the subject. Let us examine, as briefly as can be done intelligibly, the grounds on which it rests. They may be reduced to three well established facts of judicial history.

*First.* It is beyond any doubt, whatever, that the ancient common law of presumptive title to incorporeal rights founded on immemorial user, included and protected the enjoyment of light and air as one species of such incorporeal rights. This was held to be settled law as far back as the 28th Elizabeth, in *Bland vs. Manly, cited in Aldred's case, 9 Co. Rep.* 58. That was an action at law for the obstruction of the lights of a dwelling house alleged in the narr to have been enjoyed from time immemorial, *i. e.* time whereof the memory of man runneth not to the contrary, which was the prescriptive period then in force. The obstruction was by the erection of a new building on the adjoining land of the defendant. The Court of King's Bench sustained the action, holding the prescription, from time whereof the memory of man runneth not to the contrary, sufficient to raise a presumption that, originally, there had been a grant of the privilege of having the windows unobstructed. Following this case and extending through the long interval which elapsed before the prescriptive period was finally reduced to the present limitation of twenty years

by analogy to the statute of 21 James I. there were many cases, which though they did not all directly adjudge a title to light to have been acquired by the user, set up in the particular case, nevertheless fully recognized the servitude of light and air as being equally and alike with all other incorporeal rights and easements the subjects of a prescriptive title. *Pope vs. Berry*, 29 & 30 *Eliz., Cro. Eliz.* 118 ; *Leon* 168 ; *Palmer vs. Fletcher*, 15 *Car. II.*, 1 *Levinz* 122 ; *Villiers vs. Ball, I. W. & M.*, 1 *Show.* 7 ; *Rose-well vs. Pryor*, 2 *Anne* ; 6 *Mod.* 116 ; 2 *Salk.* 459 ; 1 *Ld. Raym.* 392. Thus we see beyond any question that the rule of prescriptive title as to incorporeal rights, as at first settled in the common law, protected, as one of those rights equally and on precisely the same footing with others, the one now under consideration.

But here we meet the fact that the ancient law of prescription has undergone several successive modifications and that the present inquiry is not whether the servitude of light and air was protected by the common law of the reign of Elizabeth, but whether by the later rule of title presumed from twenty years' possession, by analogy to the statute of James I.

*Second.* This brings me to observe a second fact in the history of this subject, which is that under the several successive modifications of the English law of prescriptive title, commencing with the most ancient rule of prescription from immemorial user, up to, and including, the comparatively modern rule of presumptive title from twenty years' enjoyment, by analogy to the statute of James, the rule, however modified at any period of its history, continued to be applied as well to the servitude of light and air as to any other species of incorporeal rights. The modifications undergone were not such as to narrow at all the scope or application of the rule of prescriptive title as to exclude at any period a species of incorporeal

right which had previously been protected, but their whole operation was simply to reduce from time to time the period of prescription so as to conform it to the limitations in force for the time being for entries into lands. Let us dwell a moment here and see if such was not the true purpose and effect of the successive changes in the law of prescriptive title.

The policy just stated, of conforming the period of prescription to incorporeal rights with the statutory limitation for real actions, so as to give uniformity to the mode of acquiring possessory titles to both species of real estate, has obtained from the earliest times. Thus when by the statute of Westminister 2 *Ch.* 46 3 Edw. I, the coronation of Richard I, was fixed as the period of legal memory within which a seisin must be proved in order to maintain a writ of right, it was from thenceforth adopted as the convenient period of legal memory for all purposes and became the prescriptive period for acquiring title to incorporeal rights as well as to lands. So stood the rule until the statute of 32 Henry VIII, fixed a progressive period of limitation, sixty years, for writs of right. After this time, although, as it seems, the period of Richard's reign continued to be nominally adhered to as the beginning of legal memory for the purpose of working an absolute bar, yet, in analogy to the statute of Henry VIII, sixty years' possession came to be considered as sufficient evidence of an enjoyment from the reign of Richard I. so as to raise a title unless rebutted by proof that the possession or user commenced subsequently to his reign. As such proof could rarely be made, the sixty years became practically the measure of legal memory.[*] Thus the law

---

[*] There is some confusion in the different writers' statement of the law of this period, some holding that the ancient period of legal memory, *i. e.* from the beginning of the reign of Richard I, continued unaffected by the statute of 32 Henry VIII., 2 *Wend. Black.* 31 *note* (21) ; while others considered that this statute was equitably extended to incorporeal rights as had previously been the statute

stood until the statute of 21 James I, which limited
entries into lands to twenty years. It was by analogy to
this statute, that twenty years, instead of sixty, was after-
ward, adopted as the requisite period of user for raising a
presumptive title to incorporeal rights, with this difference
however, that whereas, under the statute, twenty years'
adverse possession of land worked an absolute bar, the
twenty years' enjoyment of an incorporeal right was held
to raise only a presumptive title by grant, which might be
rebutted. 2 *Wms. Saund.* 175 *note* (2.) ; 2 *Wend. Black.* 266,
*note* (10.) ; 1 *Cromp. Mees. & Rosc.,* (217.) ; *Gale aud Whatley
on Easements,* 65.    And so the rule stood until the
statute 3 and 4 Will. III., which in effect converted what
before was only a presumptive title into an absolute bar ;
also fixing for the first time different periods for different
classes of easements ; among the rest fixing twenty years,
as the period for raising a title to light and air.    Baron
Parke in 1 *Cromp. Mees. & Rosc.* (217.)

*Third.* We come now to notice a third point in the
history of this subject, which will show quite clearly that
the rule of presumptive title from twenty years' possession
to the servitude of light and air was part of the common
law many years prior to the American Revolution.    The
point is this ; that whensoever the rule of presumptive
title from twenty years' possession by analogy to the
statute of James was adopted for incorporeal rights gen-

of Westminster, *Ch.* 20, *Gale & Whatley on Easements,* 64-5.    The probable
solution of this apparent disagreement of authorities is, that for the purpose of
working a *conclusive bar,* the reign of Richard I was adhered to as the be-
ginning of legal memory ; but that the statute of Henry VIII., limiting writs of
right to 60 years, was so far extended, as to make the enjoyment of an incor-
poreal right, for that length of time, evidence sufficient, if unrebutted, to prove
that such enjoyment had commenced as far back as the reign of Richard I.
As the rebutting proof could rarely be made, the sixty years' possession prac-
tically became the measure of immemorial user, and thus was sufficient to
raise a title, though a presumptive one only, and not one operating as an abso-
lute bar.    The point is, however, only of historical interest.

Opinion :—presumptive title a common law right prior to the Revolution.

erally, it became thenceforth, by its own force, the law of title to light and air as one species of incorporeal rights, without awaiting the occurrence of an adjudicated case of the application of the modified rule to these particular rights ; otherwise we should have this result, that while a title to some kinds of incorporeal right might be gained by twenty years' enjoyment by analogy to the statute of James, others, or at least one species, that of light and air would remain under the old doctrine of immemorial presumption requiring a period of sixty years. And thus the very principle upon which the analogy of the statute of James was adopted, viz, to give uniformity to the term required for raising possessory titles, would fail at the point where it was of most value ; for certainly such uniformity of title is more important among different kinds of incorporeal rights themselves than as between incorporeal rights and lands—clearly then the very principle upon which the equitable extension of the statute of James proceeded, necessarily made it applicable from its first adoption to every species of incorporeal right. Every statement or explanation in the books, of this rule of analogy to the statute of James, will be found to give it this broad and unqualified scope. So Lord Mansfield puts it when he says that "an incorporeal right," *i. e.*, any incorporeal right " which, if existing, must be in constant use, ought " to be decided by analogy to the statute of limitations." *Gale & Whatley* 66. And Mr. Sergeant Williams, hardly less an authority on such subjects, in his note to *Yard v. Ford*, 3 *Wms. Saund.* 175, in his explanation of the ground of the change, shows at the same time its scope and its uniform application to all incorporeal rights of every description.

We are now prepared for the direct question ; when did the present English doctrine of presumptive title to light and air from twenty years' enjoyment become a part of the common law ? The answer is that whenever the

ancient prescriptive period of immemorial user, measured
at first from the reign of Richard I, as a fixed period and
afterwards by sixty years, was abandoned as to imme-
morial rights finally, and in lieu of it the rule of twenty
years, by analogy to the statute of James, was adopted by
judicial decisions, which applied the modified rule to any
incorporeal right whatever, it became thenceforth the law
of all incorporeal rights, and as well the law of title, to
the servitude of light and air as to any other species of
right.  For the rule of analogy when applied to the first
species of incorporeal right, which called for its applica-
tion, was adopted as the law of the whole, and thus be-
came by judicial decision the law of the whole.

At what time we may then inquire, was the equitable
extension of the statute of James admitted as to any in-
corporeal right ?  The precise date it is not easy to deter-
mine.  So great a reduction of the prescriptive period as
from sixty years to twenty years, the Courts, in the
conservative spirit of that age, were slow to sanction ;
and through several reigns following that of James I, the
cases proceed upon the old doctrine of immemorial user.
It was not until early in the eighteenth century that,
pressed by the inconvenience and often impossibility of
proving an enjoyment beyond legal memory, even after
sixty years had become the measure of such legal
memory, and also yielding to the importance of a reasona-
ble uniformity in the law of possessory titles to real
estate, the courts admitted the equitable extension of the
statute of James to incorporeal rights, so far as to hold
twenty years' possession to be, not a bar, but presumptive
only of an original title by grant.*     It is certain however

---

* It is noticeable that at about the same time, i. e., early in the 18th century
both the courts of law and of equity were influenced by some common con-
siderations (probably the rendering uniform possessory titles) to adopt the
analogy of the statute of James.  For it is at that period we find the court of
equity first applied the limitation of the statute to the protection of equitable
titles.  Sir Joseph Jekylle, arg. in Floyer vs. Lavington, 1 P. Wms. 268, in
1714 ; Cook vs. Arnham, 3 P. Wms. 287 in 1734.

that this extension of the statute was adopted and fully incorporated into the common law of England prior to American Independence. The cases though not numerous are decisive. One case will serve to show that the presumption of title from twenty years' enjoyment of an incorporeal right was the common law rule as early as 1723, fifty years before our Independence. *Keymer v. Summers, Buller's N. P.* 74. 3 *Wms. Saunders*, 175, *b.* The question there concerned a right of way over an adjoining close claimed by the plaintiff under a deed for a tenement "with all ways therewith used," the deed being executed by a third person not a party to the suit. The deed was made in 1753. The plaintiff's grantor had in fact as far back as 1723 leased the adjoining close to the defendant for three lives without any reservation of the way. Nevertheless the plaintiff's grantor had from 1723 to 1753 exercised the right of way without obstruction ; and the point decided was that this user for twenty years raised in the grantor a presumptive title to the right of way sufficient to pass by his deed made in 1753.

Thus far we have considered the question as though no judicial decision holding the servitude of light and air to be within the rule of analogy to the Statute of James had occurred prior to 1776, and even had no such case occurred before that date we should be obliged to hold the doctrine as having been then a part of the common law. But it does certainly appear that before the period of our separation from Great Britain, cases for the application of the new term of twenty years' presumption, by analogy to the statute, to light and air did occur, and the Court without any doubt or hesitation held that the rule long before settled as a general one, extended to this species of incorporeal right. This was done in a series of cases both in the King's Bench and Common Pleas. These are *Lewis vs. Price* in 1761, *Dougal vs. Wilson* in 1769, and *Darwin vs. Upton,* in 1789, all reported

in 3 *Wms. Saund.* 175, a. 3. The first two of these cases were prior to our Independence, but no great stress need be laid on that fact. For according to the true force of these decisions they are to be taken not as introducing a new rule operating from their date, but rather as judicial declarations of the law previously in force. In this view, that is as judicial evidence of what the law had been on this point, *Darwin vs. Upton* also, though decided in 1789, a few years after American Independence, is of equal force with the two cases prior to 1776 ; and of great value indeed is that decision as a confirmation of the prior cases ; for it was a decision by the Court of King's Bench sitting in banc and upon much consideration. It is worth while to examine these cases together. *Lewis vs. Price,* in 1761, was an action on the case for obstructing the plaintiff's lights. The plaintiff's enjoyment of the obstructed lights extended back forty years, less than the old presumptive period of sixty years, required prior to the statue of James. Yet Wilmot J. held that the action would lie stating the rule as then understood, thus ; "that " twenty years is sufficient to give a man a title in eject- " ment on which he may recover the house itself, and he " saw no reason why it should not be sufficient to entitle " him to any easement belonging to the house." This effect of the enjoyment for twenty years and upward, he says, " is founded upon the same reason as when the lights have " been immemorial, for this is long enough to induce a " presumption that there was originally *some agreement* " between the parties." In *Dougal vs. Wilson,* in 1769, which came before the same judge sitting as Chief Justice there had been a possession of a house with lights from fifty to sixty years. He held that it could not be disturbed, but not resting his decision upon the length of enjoyment in that case, for he expressed his opinion to be, that " a much shorter time than sixty years might be sufficient," clearly referring to the modification of the old rule of prescription, after the statute of James, as embracing lights.

Then comes *Darwin vs. Upton*, in 1789, in which the question came before all the Judges of the King's Bench. The plaintiff, upon no other title than twenty-five years' enjoyment, brought his action for the obstruction of light, and he recovered before Gould J. at Nisi Prius. The case came before the Court in banc upon a rule for a new trial for misdirection to the jury, by Justice Gould. It should, however, be observed that upon the rule for a new trial no question whatever was made in that case, as to the application of the rule of twenty years' possession to the case of lights, but the exception taken was that the Judge had instructed the jury that the lapse of time constituted an *absolute bar* not to be rebutted, the defendant's counsel admitting that the twenty years' possession raised a title but as he insisted a *presumptive* title only, subject to be explained away. The Judges in banc, in opinions expressed *seriatim*, held such to be the law, and upon explanation by the Justice who tried the case that such was the meaning of his instruction to the jury, the Court discharged the rule. Says Lord Mansfield, "the enjoy-"ment of light with the defendant's acquiescence for "twenty years, is such decisive presumption of a right by "grant or otherwise that unless contradicted or explained, "the jury ought to believe it." Though, he adds, not an *absolute bar*, "it is certainly a *presumptive bar* which "ought to go to a jury." I have before said that *Darwin vs. Upton* though decided shortly after our independence, introduced no new rule as to lights, but was declaratory that the law of presumptive title for twenty years' possession, which had long before been applied to other incorporeal rights, equally embraced this one of them. Now, this view is clearly implied in the language of all the judges. For Lord Mansfield, and Justices Willes and Buller cite prior instances of the application of the rule to several kinds of easements as controlling the case of lights. And, besides, the possession on which the plaintiff in *Darwin vs. Upton* recovered, and which consequently

was held to be under the operation of the rule of presumptive title, commenced before 1776, as it was a possession of twenty-five years prior to 1789: so that the recovery necessarily assumed the rule to have been a part of the law prior to 1776. It need only be added that *Darwin vs. Upton*, as a case truly declaratory of the common law then settled on this subject, has been recognized in the later English cases, as by Buller J. in *Read vs. Brookman*, 3 *T. R.* 159, and by Bailey J. in *Cross vs. Lewis*, 2 *B. and C.* 686, 9 *E. C. L. R.* 223. It is difficult indeed to see how, in the face of such a judicial history, it can be doubted that at the period of our independence as a State, what is termed the English doctrine of presumptive title to light from twenty years' enjoyment, was a part of that common law which as an entire body or system, the Constitution of 1776 was so careful to continue in force.

*Secondly.* We must now return to the constitutional provision of 1776, and inquire whether by force of it, what we have seen to be the common law doctrine of ancient lights at the date of the Constitution, became the law of this State. It cannot be overlooked that notwithstanding the broad language of the Constitution, there were many parts of the common law of England, as it stood prior to 1776, which never have in fact been regarded by our courts as of force in this country: yet it is to be observed that the Courts have not herein acted arbitrarily in adopting some parts of the common law and rejecting other parts, according to their views of the policy of particular rules or doctrines. On the contrary those parts of of the common law of England, which have not been here practically administered by the courts, will be found on examination, to reduce themselves to two classes, resting upon grounds which render them proper to be treated as *implied* exceptions to the constitutional provision, in addition to the *expressed* exception of such parts of the common law as "were repugnant to the rights and privileges contained in the Constitution," &c.

One of these classes of exceptions may be briefly disposed of. It embraces those parts of the rules and practice of the common law which had become superseded by long settled usages of trade or business, or habits of dealing among our people, such as could not be unsettled or disturbed without serious inconvenience or injury. In such cases, upon the necessary maxim that *communis error facit jus*, the courts accepted these departures as practical modifications of the common law. Many illustrations of this class might be given, such as the use of an ink scroll instead of wax and paper to constitute a seal ; and such is the explanation of our long settled practice of allowing stays of execution without prejudice to the lien of a levy upon goods, a practice unknown at common law. Such instances are very numerous and need not be further referred to. But on the subject before us, there has certainly, during the century which has almost elapsed since our independence, been no known usage or custom, no general course of dealing or acting among our people, nor any apparent understanding of the law, inconsistent with the rule of a presumptive title, by user, to light and air, as well as to other incorporeal rights, such that the enforcement now of such a rule would unsettle or distress titles acquired or supposed to be acquired upon the faith of a different state of the law. On the contrary the general rule of presumptive title from twenty years' user of incorporeal rights by analogy to the statute of James I, of which the doctrine of ancient lights is but one of the applications, has always been received and frequently adjudged in our courts as part of that common law which was adopted under the Constitution of 1776. It so happens that no case has arisen for the application by the courts to light and air, of the general rule of prescriptive title, but it cannot be doubted that so far as our people have acted in matters of title, with any view to the state of the law on this question, they must have naturally presumed that the rule of analogy to the statute of James I, having been adopted from the

84—DEL. CH. IV.

common law and applied by the courts to such cases of incorporeal rights as had arisen for judicial decision, was adopted, not in some only of its applications at common law, but as to all. And thus we see that it is by now rejecting, and not by applying the doctrine of ancient lights, that past transactions and titles heretofore acquired, or supposed to be acquired, would be unsettled and prejudiced.

We pass then to the other class of rules which, though parts of the common law of England, have never been administered by the courts under the Constitution of 1776. This class embraces those parts of the common law which in the terms usually employed were at the period of our independence inapplicable to the existing circumstances and institutions of our people. This was a well understood limitation upon the extent to which the Colonies were considered to have carried with them the laws of the mother country, (1 *Black. Com.*, 108, 1 *Story on Cons.*, *Sec.* 148,) and without doubt the same limitation, though not expressed did attach to the provision of the Constitution of 1776. But this limitation will not be found to touch the present subject. There is less difficulty in applying the limitation practically than in attempting to define it. I understand it as excluding those parts of the common law of England which were applicable to subjects connected with political institutions and usages peculiar to the mother country, and having no existence in the Colonies, such for example as offices, dignities, advowsons, tithes, &c. ; also, as excluding some of the more artificial rules of the common law, springing out of the complicated system of police, revenue and trade, among a great commercial people and not therefore applicable to the more simple transactions of the Colonies or of the States in their early history; also it may be understood as excluding or modifying many rules of what is known as the common law of practice, and possibly of evidence, which the greater simplicity, in our system for the administration of justice, would render unnecessary or inconvenient.

But, on the other hand, our early legislative and judicial history shows conclusively that what may be termed the common law of property was received as an entire system, subject to alterations by the Legislature only. Rights of property and of person are fundamental rights necessary to be defined and protected in every civil society. The common law, as a system framed to this very end, could not be deemed inapplicable in the colonies for want of a subject-matter, or as being needless or superflous or unacceptable, which is the true sense of the limitation in question. Certain it is, as a matter of history, that our ancestors did not so treat it. Perhaps no branch of the common law was adopted in this State so entire as this law of real estate, the whole body of which, with all its rules for defining the nature and quantity of estates in lands, for prescribing the modes of acquiring title to them, and for regulating their transmission was, from the beginning, administered by our Courts substantially as in England with such modifications only as were made from time to time by the Legislature. And as a part of the common law of real estate the rule of presumptive title to incorporeal rights from twenty years' user, by analogy to the statute limiting entries into lands, has been received as the law of this State from the beginning, and frequently applied to other kinds of incorporeal rights, no case of lights before this one having arisen. Now, it was doubtless true that the common law in the very parts adopted and taking force, would in many of its special features and rules require alteration and amendment upon considerations of policy, either existing at the time of Independence or to be developed in the future. But the framers of the constitution of 1776 wisely appreciating the necessity of carrying into their new political condition some matured and completed system of jurisprudence for defining and protecting rights of property, as well as civil rights at large, chose to adopt as such a system, the body of the common law as it then stood, giving immediate and full

force in all their rules to those branches of the 'common law which, as a whole, were applicable and necessary, such as was the law of real estate. And taking into consideration this very necessity of future alterations and adjustments in particular features, the framers of the Constitution of 1776 provided for the necessity by devolving the power to make such alterations upon the Legislature. Then, following this action of the framers of the Constitution, in exact accordance with the terms of this provision, as well as with the true and universally admitted, though not always strictly observed, line of separation between legislative and judicial power, has been the uniform practice, both of our courts and our legislatures. It is well known that much of the English law of real estate, such as the rules of inheritance, and the system of entails, were out of harmony with the genius of our people ; yet these, and all other features of the common law of property, found to be inexpedient or unacceptable, were, both before and after the Revolution, excluded or modified by the Legislature only, never by the courts. It cannot be found that a single rule of property well settled as a part of the common law of England prior to the Revolution, was ever excluded from our jurisprudence by judicial decision only, although many of these rules rested originally upon reasons which had no existence in this country, and were for our people needlessly artificial ; such for a single example, as the rule in Shelly's case. On the whole, it must be clear, from uniform judicial, and legislative practice, that the inexpediency or inutility of certain rules of the common law, forming parts of an entire system or branch, such as the law of real estate, did not render those rules subject to be judicially eliminated from the system in which they were incorporated, and then declared inapplicable to the circumstances of this country, in the sense of the implied limitation we have been considering. This was never done by the courts, even as to rules of property plainly inexpedient under the circum-

stances of the country *existing at the time of independence* ; *a fortiori* would it be inadmissible upon considerations of policy developed in the subsequent growth or progress of the country, which, as we shall presently see, is the chief objection taken to the English doctrine of ancient lights.

It is a noticeable fact that the English doctrine was recognized without question as part of the common law by the early judges of the State and of this country ; judges certainly more likely than later ones to receive correct impressions of the state of our common law as originally derived from the mother country. No early adjudged cases directly upon the point are found, but the incidental expressions of opinion in the courts, sufficiently indicated the general direction of judicial and professional opinion, as in favor of the doctrine ; and this, though not authority, is evidence of no small weight that as a matter of judicial history the English rule was, at the period of our independence, regarded as part of the common law, and was not then inapplicable to the circumstances of the Colonies. The first expressions of opinion in New York were decidedly that way. *Mahan vs. Brown,* 13 *Wend.* 261 (1835) ; *Banks vs. American Tract Society,* 4 *Sandf. Ch. R.* 438. In Massachussetts the early tendency of judicial opinion was in that direction, and a statute was passed in 1852 expressly excluding the English rule. Dewey J. in *Atkins vs. Chilson and others,* 7 *Metc.* 403 (1846) ; C. J. Shaw in *Fifty Associates vs. Tudor,* 6 *Gray,* 259 (1856). So in Maryland, Dorsey J. in *Wright vs. Freeman,* 5 *Harr. & J.,* 477. So in South Carolina, where in in 1838, *McReady vs. Thom pson, Dudley,* 131, upon very full consideration the Court held and applied the English doctrine as to lights. In New Jersey, and in Illinois also there have been direct decisions holding the English rule in force. *Rabeson vs. Pettinger,* 1 *Greene, Ch. R.* 57 ; *Gerber vs. Grabel,* 16 *Ill.* 217. It was not until the year 1838, in the case of *Parker vs. Foote,* 19 *Wendell,* 318, that any

dissatisfaction with the rule appears.   That case in New York was followed in Maine by *Pierre vs. Fernald*, 26 *Me.* 436 (1847); in South Carolina, by *Napier vs. Bulwinkle*, 5 *Rich.* 99 (1852); in Maryland by *Cheny vs. Stein*, 11 *Md.* 1 (1858), and in Massachusetts, by *Rogers vs. Sawin*, 10, *Gray*, 376 (1858), and *Carrig vs. Dee*. 14 *Gray*, 583 (1860).

The objections to the doctrine taken by these cases are two—one is that the enjoyment of light and air in a tenement received over adjoining land is not an invasion of the possession of the servient owner for which he could maintain an action, and therefore is not such an adverse user as to raise against him the presumption of a grant. This objection assumes that under the true principle of prescriptive title, the presumption of a grant, arises only upon the omission of the servient owner to take a legal remedy against the easement or servitude exercised. Some learned judges have gone so far as to speak of the doctrine as "an anomaly in the law," 19 *Wend.* 318.[*]  But

---

[*] We should certainly be slow to suppose that there could have crept into a system, wrought with such delicate care and such completeness as was the common law of real estate, an anomaly unperceived by the great technical learning and acuteness of the earlier judges, and reserved to be discovered as late as the year 1838.  It would be certainly less remarkable if the later judges should have misconceived the real principle upon which the law of prescriptive title operated, especially so, as the opinions expressed by them do not appear to be based upon an investigation into the judicial history of the subject.  Such an investigation might show that the early law of prescriptive title to an incorporeal right proceeded not upon the ground of laches or neglect on the part of the servient owner to take a remedy by action, against the exercise of such right on the part of his neighbor, but that the law proceeded upon the broader ground of quieting men in the enjoyment of a privilege or benefit appurtenant to land after it had been long acquiesced in without obstruction.

A prescriptive title rests upon a different principle from that of a title arising under the statute of limitations.  Prescription operates *as evidence of a grant*, and confers a positive title.  See *Cruise's Dig. Title* 31 *Ch.* 1, *Sec.* 4. The statute of limitations operates not so much to confer positive title on the occupant, as to bar the remedy, long neglected, of the real owner.  Hence the statute is said to be properly called a negative prescription.  *Cruise Dig. Title*

an examination of the history of the law of presumptive title from immemorial user would shew that the presumption of a grant rests on a broader ground than the one stated, that is, on the long continued acquiesence of the servient owner, not alone as evidenced by his waiver of a right of action, but as well by his waiver of the unquestioned right to obstruct the privilege so far as exercised over his land. The other objection and the controlling one which has given to this course of decisions their direction, stated in the language of the cases, is that the English doctrine as to lights " cannot be applied in the growing "cities and villages of this country without working the "most mischievous consequences." *Parker vs. Foote*, 19 *Wend.* 318. It will be observed that the first objection challenges the original technical propriety of the rule ; and if tenable would support the conclusion that the doctrine of presumptive title was in the beginning erroneously applied at common law to the case of light and air. The latter objection rests upon considerations of public policy

31, *Ch.* 4, *Sec.* 1. The law of prescription gives effect to a presumed grant of the title :—the statute of limitations merely enforces the policy of quieting long possession, whether with or without title. The difference is not immaterial to the subject under discussion. For the statute of limitations, which operates only to bar an entry upon or action to recover land adversely held, can apply only where there has been a disseizin or some actionable invasion of the real owner's possession. But a prescriptive title, which is a presumed grant from long uninterrupted user, may, with respect to a servitude, well arise without any actionable invasion of the possession of a neighbor. For the presumption of title rests upon the neighbor's *acquiescence* in the servitude *with a knowledge of its exercise*; and such acquiescence may as well be evidenced by his waiving the unquestioned right to terminate the servitude by a peaceable obstruction of it in the absence of any right of action, as it would be by his waiving a right of action when such right exists †

The breadth of the principle as thus stated, upon which the English rule of prescription operated : that is that the presumptive title by grant arises from a user acquiesced in whether the user were of a nature actionable or not, was not peculiar to the English law. In all civilized countries where prescriptive

† See also a full discussion of the English doctrine of prescription in Washburn on Easements and Servitudes, Chap. 1, Sec. 4, pp. 66 *et seq.*

growing out of a state of the country developed since the
Independence of the Colonies. Now giving to both these
objections the utmost force, they still fail to meet my
difficulty, which is that the doctrine of ancient lights
being, in point of fact, a rule of the English common law
of real estate at and prior to 1776, whether upon good
technical grounds or not is immaterial ; and having by force
of the Constitution of that year become a part of our
common law of real estate, it can be altered only by the
Legislature. Meanwhile the Courts must administer the
rule, as part of the common law adopted in the Constitution of 1776, without inquiring whether, on the one hand,
it was improperly or erroneously incorporated into the

---

titles have been recognized they have proceeded upon the broad ground that
long possession of a property or user of a right, peaceably acquiesced in, is
presumptive evidence of a title to it in the manner in which it has been enjoyed. The ground of prescription universally has been, not that a remedy is
barred by lapse of time, but that title is presumed from long possession to have
been acquired. That was the principle of the Civil law of prescription, 1
*Domat* 2185, from which the English doctrine is considered to have been
derived; 3 *Cr. Dig. Tit. xxxi. Prescription, Ch.* 1, *Sec.* 3. This ancient
doctrine resting on the broad ground just stated, long preceded statutes of
limitation ; the latter operating upon the narrower principle of barring a legal
remedy instead of raising a positive title. It is true that the effect was the
same as to cases under the statutes ; for the statutes applied only to *persons disseized of corporeal hereditaments* and who, therefore, necessarily had a legal
remedy by entry or action. But it by no means follows that this narrower
application of the statutes of limitation to cases in which there was a remedy
by action to be barred, should be held to limit the long previously established
broader doctrine of prescription which included all cases whatsoever in which
the possession or user of an easement or servitude had been acquiesced in, as
well by the waiver of a peaceable right to obstruct as of a remedy by action.
And the continued application of the English doctrine of prescription to such
incorporeal rights and servitudes, the exercise of which was not actionable,
such as air, light and water, shews not an anomalous, but a quite harmonious
and consistent state of the English law of property ; one to which any legitimate objection must be on the score of policy, an objection remediable only by
legislative action. Some interesting observations upon the question whether a
possession or user in order to raise a prescriptive title must be adverse in such
sense as to give a remedy by action, are found in the opinion of Marshall J. in
*Manier vs. Meyers,* 4 *B. Mon.* 514.

law in the first instance, or whether, on the other hand, under the increase of population and the rapid growth of our cities and towns since 1776, the rule is now found to work inconveniently or mischieviously.

A few words in conclusion upon a point that has frequently pressed itself into my reflections upon this case ; that is, the danger of drawing too strictly and narrowly against the Courts the limitation between the judicial and the legislative authority to change or modify rules of the common law. It is, of course, true that any system of jurisprudence, in order to meet the wants of society, more especially the common law, which less than any other, is codified, must have a progressive development, expansion and improvement, and new adaptations to changes in the condition of society and to newly arising interests, while becoming subjects of legal protection ; and this slow and silent growth has been, and, of necessity, must be, in part, and to a large extent, the work of the Courts. Many and important modifications in the common law, both in its principles and remedies, have gradually and imperceptibly grown up, based upon what is termed a course of judicial decisions. There is one large field within which this moulding influence of the Courts may be legitimately and usefully exercised. It embraces what may be termed the administration of the common law, its process, remedies, rules of practice and of evidence. In all that concerns these it is difficult to see why the Courts should feel themselves restricted in modifying and re-adapting them in details from time to time as experience or changes in the condition of society may render obviously expedient. For those who administer the system and are personally cognizant of the operation of its rules and modes of procedure can better comprehend the necessity, and precise extent of any changes or re-adaptations which may be required, and the best methods of effecting them. And certainly the conservative temper, so characteristic always of the

85—DEL. CH. IV.

judicial mind, renders it a safe depository of such a power. There is another department of the common law in the growth of which the influence of judicial decisions has been largely felt. This embraces all that body of rules and principles which regulate the transactions of trade and business. It is true, no precipitate, sudden or radical change in these has been ever made except by acts of legislation : such for example, as was the statute of Ann giving negotiability to promissory notes ; but upon this statute there has been built up, mainly by the slow course of judicial decisions, the whole body of the law merchant. All this is an unavoidable and legitimate exercise of the judicial function. But there is one branch of the common law in which the Courts have scrupulously and wisely refrained from any judicial changes. That embraces all those rules and principles which directly concern what may be called the fundamental social rights, rights of persons and of property, especially the latter. The rules which define and protect these, operate directly upon the people whose experience under such rules is the best test of the expediency of changes in them. Hence, for such changes, legislative action only is appropriate and safe, and on such changes the Courts do not venture,

With respect to the law of property there is an additional and very important reason for this caution, *i. e.,* that judicial decisions, in theory at least, are supposed not to alter but simply to declare and administer the law ; so that a decision or a course of decisions which in effect should change or modify a rule of property by declaring it otherwise than it has before been understood to be, operates retrospectively, affecting not only future titles, but also titles before acquired and transactions entered into in reliance upon a different state of the law. So great a mischief is the unsettling of confidence in titles held to be, that, rather than incur the hazard of it, the Courts have not unfrequently refrained from declaring, as

a rule of property, what would have been well founded upon legal principles applicable to the subject-matter, solely because it was apprehended that titles were resting upon a generally accepted different state of the law. A striking example, among many, of this caution is found in the English decisions which continued to deny dower to the widow out of an equitable estate of her deceased husband long after these estates had been subjected, in equity, to all the incidents of legal estates, even to the curtesy of a surviving husband. The allowance of curtesy and the denial of dower out of estates of precisely the same nature was felt to be anomalous and an unreasonable discrimination against the wife. This is acknowledged by so great a judge as Lord Redesdale, in *D' Arcy v. Blake,* 2 *S. & L.* 388. Courts of equity, he says, "had "assumed as a principle in acting upon trusts to follow the "law ; and, according to this principle, they ought in "all cases where rights attached on legal estates, to "have attached the same rights upon trusts, and, con- "sequently, to have given dower of an equitable estate. It "was found, however, that in cases of dower, this principle, "if pursued to the utmost, would affect the titles to a "large proportion of the estates in the country; for that par- "ties had been acting, on the footing of dower, upon a con- "trary principle, and had supposed, that by the creation of "a trust, the right of dower would be prevented from attach- "ing. Many persons had purchased under this idea," \* \* \* \* \* \* "But the same objection did not "apply to tenancy by the curtesy ; for no person would "purchase an estate subject to tenancy by the curtesy, "without the concurrence of the person in whom the right "was vested. This I take to be the true reason of the "distinction between dower and tenancy by the curtesy. "It was necessary for the security of purchasers, of "mortgagees, and of other persons taking the legal "estates, to depart from the general principle in case of "dower ; but it was not necessary in the case of tenancy

" by the curtesy." And so dower out of equitable estates continued to be denied until finally this anomaly in the law was corrected by the Statute of 3 & 4 Will. 4 *Ch.* 105.

Now, to apply this conservative rule of judicial action to the present case, how can it be doubted that during the long interval after the adoption of our State Constitution in 1776 until at least the year 1838 when the doctrine of ancient lights as part of the common law of this country was first drawn into question, it must have been practically recognized as the law of this State in any transaction depending upon the question ; and that it would have been so adjudged had any case arisen for its judicial application ? And can there be doubt that at this day there may exist in this State, rights materially affecting the value and enjoyment of property supposed to have been acquired under the common law of ancient lights, since, as yet, no contrary rule has been declared by our courts or could reasonably have been inferred to exist ? Certainly it is wise not now · to risk the unsettling of such interests by judicially declaring the rule to be what, until recently, neither our courts nor the bar nor the people concerned could with reason have supposed it to be ; on the other hand a legislative alteration of the law will serve all the considerations of policy which have been urged against continuing the doctrine of ancient lights, and yet by operating, as it would, prospectively, will leave undisturbed any interests which may have grown up under a reasonable belief that the old law was still in force.

NOTE. This case will be found annotated in the American Law Register, for January 1876, Vol. XV, p. 26, N. S. There are however few cases referred to in addition to those cited in the opinion. Neither the comments of the annotator nor the extracts given from the authorities attempt any answer to the reasoning of this opinion. The only value of the note, therefore, is by way of reference to some additional cases, all of which appear upon examination to rest upon grounds which are fully discussed and criticised in this case.