JAMES HULLEY

*vs.*

THE SECURITY TRUST & SAFE DEPOSIT COMPANY *et al.*

New Castle, at Chambers, May 25, 1885.

*Ancient lights; obstruction of, by adjoining owner; English doctrine as to prescriptive right in; adoption of, in Delaware, as part of common law, doubted.*

1. It seems that neither the Statute of James I., limiting entries into lands to twenty years, nor the analogies thereto declared by the English Courts (including the acquisition of title to light and air over the

land of another, arising from an uninterrupted enjoyment for twenty years), were adopted as part of the common law by the Delaware Constitution of 1776.

2. A preliminary injunction to restrain the erection of a building opposite to, but separated by a space of three feet from, complainant's building, in which windows had been in use for twenty years, refused,—the fact of a prescriptive right to an uninterrupted access of light and air over the defendant's land not being clearly made out by the evidence (even if the doctrine of such right prevails in this State, which is doubted), and a case of substantial injury to the complainant not being made out with certainty.

3. The case of *Clawson* v. *Primrose*, 4 Del. Ch. 643, commented on and distinguished on the facts, but neither affirmed nor overruled.

BILL TO ENJOIN THE ERECTION OF A BUILDING. — It appears that one Daniel Hulley, in his lifetime, about the 22d day of September, 1849, became seised in fee of certain lands and premises described in the bill of complaint in this cause, situate at the corner of Shipley and Sixth Streets, in the City of Wilmington, and that he erected thereon, about the year 1850 or 1852, a three-story, brick building ; that between said building and the premises adjoining, on which there was also a building used as a dwelling, there ran for a short distance a three foot alley, which was used in common by the adjoining owners ; that on the southerly side of said building, and opening over and upon said alley, the said Hulley caused a sash door and two windows to be constructed at the time of the erection of the said building ; that the said sash door was on the ground floor of the building, and the said two windows were, respectively, in the second and third stories thereof, in a vertical line with each other.

The bill states that the said door and windows have continued to remain, from the time they were constructed to the present, unaltered and in use, for the purpose of supplying the portion of said building in which they are situated with light and air, and that said windows and door are the only means by which the portion of said building in which they are situate has been supplied with light and air.

On the premises, immediately opposite and also bounded by the said three foot alley, there is a dwelling and a board fence,

about the height of the said door in the Hulley building, and extending from the dwelling on said opposite premises back thereof, the length of said alley.

The defendant, the Security Trust & Safe Deposit Company,,has purchased said adjoining premises, and purposes erecting thereon a new brick building as high as or higher than that portion of the building erected by Daniel Hulley which contains the windows and door above mentioned, which the complainant says will deprive him of the use of his accustomed light and air, over that portion of the opposite lot of ground which had not theretofore been built upon, which he estimates in his bill as fourteen feet in length along the alley, by twenty-five feet in breadth.

The plaintiff and Catherine Neals, Elizabeth Neals, Elijah J. Hulley, Sally Martin, John Martin and Launcelot Martin, who have been joined as codefendants with the Security Trust & Safe Deposit Company, are the heirs at law of the said Daniel Hulley.

The bill prays that the Security Trust & Safe Deposit Company, its agents, servants and employees, may be perpetually restrained by injunction from erecting or causing to be erected any wall, building, or structure along, upon or near the line of the southerly side of said " three feet wide " alley of such height, shape or dimensions as to prevent, obstruct or interfere with the access of light and air to said ancient windows or door, or either or any of them, substantially as the same are now enjoyed.

*Edward G. Bradford* for the complainant.

*Benjamin Nields* for the defendants.

THE CHANCELLOR.—Upon the presentation of the complainant's bill, I granted a rule to show cause why a preliminary injunction should not be awarded restraining the Security Trust & Safe Deposit Company from erecting a wall or building along the side of said alley, opposite to the Hulley building, so as to obstruct the free light and passage of air

substantially to the same, with a restraining order until the determination of the rule.

The defendant has filed an answer to the bill.   Each party to the cause has supported, or attempted to do so, his respective side of the controversy, by the affidavits of witnesses; and I now proceed to decide whether an injunction shall be awarded or refused.

A court will not grant an injunction in a doubtful case. *Bonaparte* v. *Camden & A. R. Co.* Bald. 218.

A plaintiff, in an action to restrain an obstruction to ancient lights, cannot obtain an injunction unless he proves substantial damages.   1 High, Inj. §§ 859, 861, 868.

In the case of *Kino* v. *Rudkin*, L. R. 6 Ch. Div. 160, Fry, *J.*, said: " It is necessary, in order that an injunction should be granted, for the plaintiff to show that there will be a permanent obstruction of light, to such an extent as to render the occupation of his house less comfortable than it was before, or to prevent the tenant from carrying on his business as beneficially as he could before, or that the plaintiff, as the owner of the reversion, will suffer substantial or material damage by the lessening of its value."

In *Clarke* v. *Clark*, L. R. 1 Ch. App. Cas. 16, Lord Cranworth, *Chancellor*, said : " The real question is not what is scientifically estimated the amount of light intercepted, but whether the light is so obstructed as to cause material inconvenience to the occupier of the house, in the ordinary occupations of life."

In *Robson* v. *Whittingham*, L. R. 1 Ch. App. Cas. 442, the principle which seems to have been decided is this : " That the court will not grant an injunction to restrain the erection of a building on account of its obstructing the plaintiff's light, unless the plaintiff can show that he will sustain substantial damage.   If he cannot do this, his ground of application to the court fails."

The ruling in *Dent* v. *Auction Mart Co.* L. R. 2 Eq. Cas. 238, was this : " In order to support an injunction to restrain obstructions of light and air, it is generally necessary, and suf-

ficient, that the case be one in which substantial damages would be recovered at law."

*Vice-Chancellor* Wood, in the case of *Yates* v. *Jack*, L. R. 1 Ch. App. Cas. 295, said: "I cannot, myself, arrive at any other conclusion than this: that where substantial damages would be given at law, as distinguishable from some small sum, —£5, £10, £20,—the court would interfere."

The principle which seemed to commend itself to *Vice-Chancellor* Kindersley in the case of *Martin* v. *Headon*, L. R. 2 Eq. Cas. 433, seems to be this: that " The damage done by the neighbor's act may be so trivial as not to justify the interference of the court. But wherever it is shown that the comfort or enjoyment of a man or his family in the occupation of his house is seriously interfered with, and, still more, where he is prevented from carrying on his business with the same degree of convenience and advantage as theretofore, by reason of the obstruction of light caused by his neighbor's new buildings, there is sufficient grounds for the interference of the court of equity."

I think the doctrine of the English Courts in reference to the obstruction of ancient lights may be considered as reduced to these principles:

1. Where the darkening of the ancient windows of a dwelling-house materially injures the comfort of the existence of those who dwell in it, the court will interfere by injunction.

2. Upon a similar principle, where the obstruction of the ancient lights of a manufactory or of business premises renders the building, to a material extent, less suitable for the business carried on in it, it is a case for injunction, and not merely for compensation by damages.

3. But in a case where, looking to the house of the plaintiffs as it then was and to the use which was then made of it, and not taking into account any change or different use of the premises, the erection of new buildings which would not injure the comfort of the existence of those who dwell in said house, or render it less suitable for the business which was then carried on in it, to such a material extent as to require the

interference of a court by injunction,—the court will decline, in suit by the owners and occupiers of the property alleged to be injured, to interfere.

4. Nor will the court interfere where, if the injunction, if granted, would be founded, not on the extent of present injury, but upon an injury having a regard to a possible future designation of the premises which might affect their value.

It is unnecessary, on the present motion, to inquire further as to the circumstances under which the obstruction of ancient lights will be restrained in England. The subject is very fully treated of by text writers, and by very numerous authorities both there and in this country; nor do I deem it necessary to enter into an extended discussion of the question whether the doctrine of ancient lights as held in England should be recognized as applicable to this country.

In *Parker* v. *Foote,* 19 Wend. 309, the court said: " There is, I think, no principle upon which the English doctrine upon the subject of lights can be supported. It is an anomaly in the law. It may do well enough in England, . . . but it cannot be applied in the growing cities and villages of this country, without working the most mischievous consequences."

This decision has been followed very generally; but it has not been adhered to in this State, at least in one very able opinion by my predecessor, in the case of *Clawson* v. *Primrose,* 4 Del. Ch. 643; but the dissatisfaction with the English doctrine has not wholly ceased here, notwithstanding that very able opinion.

Before I proceed to refer more particularly to that opinion, it is proper to consider more fully the matters of fact involved in the present inquiry in relation to the rule upon the Security Trust & Safe Deposit Company, why an injunction shall not be awarded against it, restraining it from the erection of a building along the alley dividing the property of the complainant and its property, of a height which the complainant alleges will materially obstruct the light and air of a door and two vertical windows in the Hulley building.

The facts appearing from the affidavits filed in support of the bill and the answer seem to be these : Daniel Hulley purchased, about 1848 or 1849, the premises now owned by his heirs at law on one side of the alley spoken of in the bill, and one Logan owned on the other side of the alley. The alley is known as what is commonly called a blind alley. Logan's lot was built on, and he extended an addition to his main building, a frame kitchen, to within eight or ten feet of the head of the alley, which space was inclosed by a close board fence extending from the kitchen along the side of the alley to the head thereof.

Hulley tore down and removed the buildings that were then on his lot, except part of a wall, and erected a building having in the back part thereof the door and two vertical windows referred to in the bill. This door and these windows fronted upon the open space of eight or ten feet, and which space, inclosed as aforesaid by a close board fence, extended some twenty or twenty-five feet across the Logan premises, since purchased by the defendant company. The defendant has torn down the buildings on its premises, and has commenced the erection of a new building, to extend from Market to Shipley Street, and of a height greater than the walls of the Hulley building, and which, when extended on the opposite side therefrom, will be only three feet, the width of the alley, from it. It is this portion of the wall which the defendant proposes to build, the building of which the complainant seeks to restrain—on the ground, as he alleges, that the wall will materially obstruct his ancient lights, the said door and two vertical windows.

The Hulley building was formerly, and when first known, used as a dwelling and second-hand furniture store.

John Smithurst, whose affidavit is offered in support of the complainant's bill, states that from 1855 to 1864 he was a resident of Wilmington, five years of which he resided in and did business in said building. He states that the only ventilation in and light to the middle rooms of the building are derived from the sash door and two vertical windows. Of

course he means the middle rooms in the back building. He thinks that, should they be closed or darkened, the property will be seriously damaged, rendering the middle rooms unfit for dwelling or business purposes.

No other witnesses who have occupied the building have been examined in support of the complainant's bill, and no one who has ever lived in the building has made affidavit in support of the complainant's application, except the complainant himself and Smithurst. Indeed it does not appear that the building has been occupied as a dwelling during a number of years past. It is now used as a laundry (known as the Wilmington Laundry), by a sail maker, and is also used as a place of meeting for various societies.

The lower floor of the back building does not appear to be now occupied. The floors in the rooms in which the alleged vertical windows are, are occupied, and the three tenants thereof make affidavit that the erection of the proposed wall would not be any inconvenience or injury to them or their business ; nor would the building be rendered unsuitable for their business, or any business that might be carried on therein, by reason of the erection of the proposed wall or building.

It appears that Daniel Hulley died on or about the 9th day of October, 1867 ; and it is not proved that the building was thereafter occupied as a dwelling, unless it be supposed that the five years during which Smithurst lived in it were after the death of Daniel Hulley, which cannot reasonably be so, as Smithurst states in his affidavit that he resided in Wilmington from 1855 to 1864. He must, therefore, have occupied this building previous to the death of Daniel Hulley, and not subsequent thereto. If this supposition be true, it has not been proved that the building has been occupied as a dwelling during the last twenty years, for it is not stated where Daniel Hulley died, and he may not have occupied the building at the time of his death. If he did, however, occupy it at the time of his death, it does not appear that it has been so occupied by any person as a dwelling subsequent to his death.

It is true that the bill states that the portion of said building erected by Daniel Hulley, and containing such ancient lights, has been used from time to time as a dwelling-house, but for the last five or six years has been used as a laundry, known as the city laundry, requiring a plentiful supply of light and air. From this statement of the bill we are left in the dark as to what is meant by the words "from time to time." The names of the occupants of the building as a dwelling are not given, nor the periods respectively for which different persons who have so occupied it, nor when the tenancy of those occupying it from time to time commenced or ended.

The affidavits of Robert B. McDonnell, George B. Hageny and Widdington Bradley, who have occupied the said back building for business purposes, are in direct conflict with those of Smithurst and the complainant.

The other persons who have made affidavits have never resided in the said building, or occupied the same, in any manner whatever.

It is enough for me to say that I rely more upon the testimony of the tenants who have and do occupy the property, as to the building being rendered materially unsuitable either for business carried on in it, or as being likely to be rendered materially unsuitable, either for business carried on in it or as being likely to be rendered unfit or materially inconvenient as a dwelling, by the erection of the proposed wall, than upon the opinions of those who have not had the same opportunity to form correct opinions in respect to these matters.

*Chancellor* Bates, in the case of *Clawson* v. *Primrose, supra,* decided :

1. That the doctrine of presumptive title to light and air received over land of another person, arising from the uninterrupted enjoyment of it for twenty years and upwards, through the window of a dwelling-house, was part of the common law of England, and of the Colonies at the period of American Independence, and as such continued to be the law of Delaware, under the Constitution of the State adopted at the organization of the State Government in 1776.

2. A court of equity will restrain the obstruction of lights by erection of adjoining buildings, only when the privation of light and air by the proposed erection will be in such degree as to render the occupation of the complainant's house uncomfortable, if it be a dwelling-house, or if it be a place of business, materially less beneficial than it had formerly been.

3. A fair test of what is such privation of light, etc., is that a jury would give substantial, and not merely legal, damages.

The second and third points decided by him are in substance conformable to the decisions of courts of equity in England upon this subject.

I do not propose to affirm or overrule the case of *Clawson* v. *Primrose*. It is not necessary to do so, in the view I take of the present application. The decision in that case was made by an eminent and learned chancellor, for whose opinions I have the greatest possible respect. The decision has not been reversed by the court of appeals. It therefore remains as a decision of the court of chancery in this State, subject to affirmance or dissent whenever occasion may arise. It may not, however, be unprofitable or uninteresting to consider the first point decided in *Clawson* v. *Primrose*. It is apparent to the reader of the opinion in that case that it was mainly decided on that point.

Article 25 of the Constitution of September, 20, 1776, adopted upon our separation from England and organization into an independent State Government, was as follows: "The common law of England, as well as so much of the statute law as has been heretofore adopted in practice in this State, shall remain in force unless they shall be altered by a future law of the Legislature; such parts only excepted as are repugnant to the rights and privileges contained in this Constitution and the Declaration of Rights, etc., agreed to by this Convention."

It is said in the case of *Clawson* v. *Primrose* that the provision of our State Constitution of 1776, adopting for the

new State Government the body of the common law, and in part the Statutes of England, is the same, in substance, with the declaration of the Congress of 1774, of what had before· been held to be the force of the English common and statutory law in the Colonies; and the obvious purpose and effect of article 25 of the Constitution was to give to the common law in this State, by constitutional adoption, the same force· under the new government which, in the previous political condition, it had by virtue of the colonial relationship to the· mother country.

By the common law, says *Chancellor* Bates, was of course meant the common law of England as it then stood, so far as it was applicable to the circumstances of the people, and was not repugnant—as the Constitution expresses it—to the rights and privileges contained in that instrument and the Declaration of Rights.

The qualification here expressed, of "so far as it was applicable to the circumstances of the people," may be very material and of great potency in determining the existence of that portion of English common law in this State which relates to the obstruction of ancient lights.

"The Congress of 1774," says *Judge* Story in his Commentaries, "in its enunciation of fundamental rights and immunities which were claimed for the American subjects of Great Britain, placed among the foremost of them, as we have seen, the declaration that they were entitled to the common law of England, as also to such English Statutes as were in force at the date of their colonization, and which by experience they had found applicable to their circumstances."

It is said in *Clawson* v. *Primrose* that "The provision of our State Constitution of 1776, adopting for the new State· Government the body of the common law, and in part the statute law of England, is the same, in substance, with the declaration of the Congress of 1774."

It is a fact that the English doctrine in respect to the obstruction of ancient lights has been followed in but few of the States.

The question would appear to be this: Was the law of England in relation to ancient lights applicable to the circumstances of the people of Delaware, at the time of the adoption of the Constitution of 1776?

It was not meant, I apprehend, by article 25 of the Constitution of 1776, to provide that the common law, as it existed in England at that day in its entirety, and as respects every subject matter and thing, was to be the law of this State until altered by an Act of the Legislature. It would not be difficult to show, it is thought, that such things were recognized as parts of the common law of England as could not have been included in said article. The *lex non scripta*, the unwritten or common law of England, included not only general customs, or the common law properly so called, but also the particular customs of certain parts of the kingdom, and likewise those particular laws that were by custom observed only in certain courts and jurisdictions. This unwritten or common law is properly distinguishable into three kinds. It is only necessary to notice the first, which is general customs. "These," says Blackstone, "are the universal rule of the whole kingdom, and form the common law in its stricter and more usual signification . . . The common law properly so called," he says, "is that law by which proceedings and determinations in the King's ordinary courts of justice are guided and directed. This, for the most part, settles the course in which lands descend by inheritance; the manner and form of acquiring and transferring property; the solemnities and obligation of contracts; the rules of expounding wills, deeds and Acts of Parliament; the respective remedies of civil injuries; the several species of temporal offenses, with the manner and degree of punishment, and infinite number of minuter particulars which diffuse themselves as extensively as the ordinary distribution of common justice requires." 1 Bl. Com. 67.

This is the meaning of the " common law," I apprehend, as used in article 25 of our first Constitution.

I do not see how it can be reasonably supposed that the Statute of James, referred to in the case of *Clawson* v. *Prim-*

*rose,* existed in either the Colony or State of Delaware.   I do not now recollect of any judicial decision in this State declaring that it did so exist.   In fact it could not so have existed. It never was declared by any statute, either before or after the adoption of the Constitution of 1776, to be in force either in the Colony or State.

In the Act (1 Del. Laws, 64, chap. 22) entitled "An Act. for the Advancement of Justice and More Certain Administration Thereof," it is said : "*Whereas,* the common law is justly esteemed the birthright of English subjects, and ought to be regarded in this government as the safest rule of our conduct ; *and whereas,* Acts of Parliament have been adjudged not to extend to these plantations, except when they are particularly named in the body of such Acts, and forasmuch as some persons have been encouraged to transgress certain statutes against capital crimes and other enormities, because those statutes have not been fully extended to this government ; and also that His Majesty's good subjects, the inhabitants thereof, have not yet been so happy as to obtain the royal confirmation of any law for the better establishment of their Constitution and government,—for the preventing, therefore, any failure for the future in that behalf, may it please the government that it may be enacted," etc.   The date of this Act was 1719.

The Statute of James, entitled "An Act for a Limitation of Actions and for Avoiding Suits in Law," was passed in 1623.   James died March 27, 1625.   Delaware was not settled until after the death of James.   It is generally said to have been settled by the Swedes.   It was not till 1655 that. the transient connection of Sweden with our colonial history ended.   From this period till 1664 the Dutch, who had expelled the Swedes, held control of the Delaware settlements.   In this latter year the Duke of York came into possession of all that the Dutch had occupied.   In 1682 he made a deed feoffment of New Castle, and twelve miles from New Castle to the Honekillis, to William Penn.   In the same year the three counties of Delaware were annexed to the Province

of Pennsylvania by William Penn, who had, it is said, received letters patent for them from Charles II. of England. The first act of settlement by Penn, the proprietary and Governor of Pennsylvania, was made in 1682.

Afterwards, sometime between 1701 and 1704, the three counties on the Delaware—New Castle, Kent and Sussex— became a separate government, having no longer any connection with the Province of Pennsylvania, and having a separate Legislature of their own.

Of course there could not be before that time any recognition by the Colonial Government of any Statute of James I., and it does not appear, from any of the Acts of the Legislature of the Colony, what were the provisions of the Act of the Colony, entitled "An Act for the Limitations of Actions," repealed in section 8 of the Act entitled "An Act for the Limitation of Actions and Proved Accounts against the Estate of Persons dying within this Government." 15 George II., about the year 1742. Whatever was the date, however, of the Act so repealed, and the provisions of which are not now known, it must necessarily have been subsequent to the erection of the three counties into a separate government. The Act of 15 George II. is the first law in Delaware of which we have at present any knowledge in respect to the limitation of actions; and although this Act, in respect to the entry into lands, tenements or hereditaments, is similar in its provisions to the Statute of James I., it nowhere mentions that Act, and has no reference whatever to its provisions.

I conclude, therefore, that the Statute of James never had an existence in the State of Delaware; but the Act of Limitations in respect to actions (15 George II.), being an independent Act of the Colony of Delaware, enacted by its own Legislature, was the only Act upon that subject existing in Delaware at the period of its enactment. It would follow, therefore, if this be so, that no decisions of the Courts of England, made under the authority of the Statute of James, or in analogy to it, have any force or effect in this State. If any statute was in force upon the subject of the right or title

of entering into lands, etc., it must necessarily have been the Act of 15 George II., and the supplement thereto passed in 1773; and if there were any decisions of any court other than the Courts of Delaware, founded upon any other Act of Limitation of actions, or upon any analogies thereto, the same could not have any binding force upon the judiciary of this State, at the time of the adoption of the Constitution of 1776, or subsequent thereto.

I have failed to discover any decision made prior to 1776, upon the subject of the easement as to light and air, founded on the analogy of the Act of 15 George II., in respect to the right of entry into lands. I ask, therefore, can it, with propriety, be said that the framers of our Constitution of 1776 meant, by article 25 thereof, that the analogies declared by English judges and chancellors to the Statute of James I., or that the statute itself, should remain in force in this State, when the statute itself, and therefore its analogies, had never been enforced in this State?

I shall not dwell upon the subject of immemorial usage. The curious upon this subject will find a very interesting note thereon to 2 Blackstone, Com. chap. 17. I also refer to Goddard on Easements, p. 89.

In 1873 the question of the right of an easement by one over the land of another came before the superior court of this State in the case of *Cooper* v. *McBride*, 4 Houston, 461. In that case it was decided that a continued and uninterrupted adverse use of a private way over another's land for twenty years establishes a legal right to use and enjoy it; but such use of it must be under a claim of right, and not by the consent, license or indulgence merely of the owner; for this is the meaning of the term "adverse" when it is thus employed in its legal sense. If the use of it, however, commenced with the consent or the permission of the owner of the land, or those through whom he claims, it cannot grow or ripen into a right so long as the consent or permission is presumed to continue; and it will be presumed to continue until it is satisfactorily shown to have been afterwards continuously used and enjoyed for twenty years, as a right.

In the opinion in this case the court says nothing in respect to a grant supposed to have been made and lost, but bases its opinion solely on adverse possession, or enjoyment or use, for twenty years as a right.    Indeed this theory in respect to a grant supposed to have been lost, in respect to light and air, is a mere fiction of the judicial brain, and never as a fact could have existed.

What separate interests or estate can any man have in light or air?    God said: "Let there be light!" and it instantaneously flashed for the use and enjoyment of all created beings. It was common to all, and several in none.    The most that man could do in respect to it was, not to grant it, but to covenant that he would not deprive his fellowmen of their enjoyment by obstructing its free passage.

The same remarks are applicable to air.    "The wind bloweth where it listeth, and thou hearest the sound thereof, but canst not tell whence it cometh or whither it goeth."

Goddard, in his work on Easements, says: "If it can be shown that no grant could have been legally made, or that any easement lawfully created must have been subsequently extinguished by unity of seisin, or otherwise; or if it can be shown to be a very improbable thing that a grant ever was made,— the presumption cannot arise, and the title by prescription fails."

Now the door and two vertical windows in the Hulley building could not have existed before 1852, for the building was erected in that year.    Thus a right founded on immemorial usage—that is to say, upon usage the commencement of which extended so far back that the memory of man runneth not to the contrary—is proved not to have commenced before the year 1852, and the period of twenty years is sought to be established as the extent to which man's memory is limited, in its race backwards, because that is the period ascertained by judicial decisions by analogy to the Statute of James,—a statute which never existed in this State,—which limited the right of an owner of land to make entry thereon in assertion of his right thereto.

The canons of descent are rules of property; but can it be said, with propriety, that a statute of limitations which bars the right of an owner to the use of legal means for the recovery of his property is in a similar sense a rule of property? Property is not acquired by one man because another is barred by a particular statute from prosecuting, by legal means, his right of property, but because that property is held by some other person adversely to his claim of right. Is it probable that a grant was made in 1852, by the owner of the opposite premises, to Hulley, to the enjoyment of light and air over the eight or ten feet opposite the door and two vertical windows?— or is it highly improbable, there being a close-board fence about the height of the door opposite thereto? Which is the more probable,—that Hulley received a deed, which he lost, for the enjoyment of the air and light over the space opposite the door and two windows; or that he enjoyed the light and air, by the indulgence of the owner of the premises opposite his, and by the nonerection (by such owner) of obstructions sufficient to exclude him from its use and enjoyment? Is the former proposition probable, or is the latter proposition highly improbable?

It will be seen, from the cases cited in this opinion, that a distinction is made between dwellings and shops or places of business as to the amount of light and air required by them. There is no proof shown by the affidavits of either the complainant or respondent that any portion of the Hulley building, either the front part thereof or the back part thereof, has been used as a dwelling within a period of twenty years or more. It must have been used for some purpose or purposes, but what is not disclosed. The door and vertical windows are located in the back part of the building. This appears to have been used as a second-hand furniture store, as an undertaker's shop, as a place occupied by a sail maker, by a justice of the peace as an office, and as a laundry,—but whether for any other purpose is not disclosed, unless some part thereof was used by some of the societies which met in the front building of the Hulley buildings.

The witnesses who had occupied the back building, as far as their names have been disclosed, have made affidavits that the erection of the proposed wall by the defendant would be no inconvenience to their business; and I think some of them have gone so far as to say that it would be no inconvenience to any business that might be carried on in said building.

There is this difference between the case of *Clawson* v. *Primrose* and this case: In the former case it appears that the complainant was the owner and occupier of a dwelling-house in the Town of Smyrna, and that joining on the northerly side was an improved lot of the defendant. In the complainant's house were several windows over the defendant's lot, through which light and air were received into the house. At what precise time these windows were opened did not appear; but it was proved that they had been in their present condition and used by successive owners and occupiers of the dwelling house for a period of over thirty-five years. The defendant being about to remove a frame tenement to the lot, and locate it against the northerly side of the dwelling-house, so as wholly to darken the windows, the bill was filed for an injunction to restrain the proposed obstruction.

There is a short blank alley between the Hulley building and the premises opposite, three feet wide. The complainant does not state, of course, that the erection of the proposed wall will wholly darken the door and windows mentioned in his bill; but that the light and air accustomed to pass through them over the space on the opposite side would be materially diminished, and that he would thereby suffer irreparable damage.

In the foregoing remarks in respect to the construction of article 25 of the Constitution of 1776 of this State, and of the Statute of James, and of the decisions in respect thereto, and of the statutes of this State in reference to the limitation of the right of entry on land, and of the doctrine of immemorial usage, my object has been not to deny or affirm the principal rule in the case of *Clawson* v. *Primrose*. That case, for the present, I leave where it stands,—a decision of this court

entitled to great respect, made by a learned and able chancellor, and whose opinions I should hesitate to dissent from, even in a case which seemed at first view to demand such dissent. I have made the remarks in respect thereto because the subject is an interesting one, and that is the only decision which has ever been made in this State on that subject, and which was rendered nearly one hundred years after the first Constitution of this State was framed. My remarks may awaken attention, perhaps, to the subject, should it ever again come before the courts of this State for decision. Perfectly free and unembarrassed by it, I shall discharge the rule in this case; and my action in this respect will not be at all in conflict with the necessary ruling in that case.

The rule is discharged.